PATRICIA RIVET MURRAY, Judge.
 

 | ¡In this criminal appeal, the defendant, Jeremy Johnson, appeals his conviction for manslaughter and eighty-year sentence as a habitual offender. Finding no error, we affirm his conviction and sentence.
 

 STATEMENT OF THE CASE
 

 On February 6, 2003, Mr. Johnson and Quantrell Kelson jointly were charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1. They both pleaded not guilty. In March and May 2003, the trial court found Mr. Johnson incompetent to proceed. In November 2003, the trial court found Mr. Johnson’s competency was restored and that he was able to stand trial. In June 2005, Mr. Johnson and Mr. Kelson jointly were tried by a twelve-person jury. The jury convicted both of them of the responsive verdict of manslaughter. On June 15, 2005, the trial court denied their motions for new trial, sentenced them both to serve forty years at hard labor, and denied their motions to reconsider sentence. The State then filed multiple bills against both of them. On August 1, 2005, the trial court adjudicated both Mr. Johnson and Mr. Kelson | .¿second-felony habitual offenders.
 
 *1193
 
 On August 4, 2005, the trial court vacated the original sentences imposed on them. Mr. Johnson was resentenced to fifty years at hard labor. The co-defendant, Mr. Kelson, was resentenced to forty-five years. Both Mr. Johnson and Mr. Kelson were granted appeals.
 

 Due to the intervention of Hurricane Katrina, the record was not lodged in this court until May 2006, and transcripts of the proceedings were unavailable. The court reporter responsible for those transcripts certified that her notes and tapes of the proceedings were lost when her home flooded as a result of Hurricane Katrina. Because the transcripts were lost due to no action (or inaction) on the part of Mr. Johnson or Mr. Kelson, this court found their rights to meaningful review of their convictions and sentences were violated. Consequently, this court vacated both of their manslaughter convictions, habitual offender adjudications, and sentences; and remanded the case to the trial court for further proceedings.
 
 State v.
 
 Kelson, 06-0477 (La.App. 4 Cir. 7/26/06), 936 So.2d 321 (Unpublished Opinion Table).
 

 On June 11, 2007, the trial court denied the motions filed by Mr. Johnson and Mr. Kelson for severance and to suppress the evidence, statement, and identification. On December 21, 2007, the State filed a substitute bill of information charging Mr. Johnson and Mr. Kelson with manslaughter, a violation of La. R.S. 14:31. On January 18, 2008, the trial court, over the State’s objection, granted Mr. Kelson’s motion to sever. On April 3, 2008, this court denied the State’s writ application regarding that ruling.
 

 |sOn December 10, 11, and 15, 2008, Mr. Johnson was tried before a twelve-person jury and found guilty as charged of manslaughter. On December 22, 2008, the trial court sentenced Mr. Johnson to forty years at hard labor without benefit of parole, probation, or suspension of sentence. On that same date, the trial court denied Mr. Johnson’s motion to reconsider sentence and adjudicated Mr. Johnson a second-felony habitual offender. The trial court then vacated the sentence previously imposed and resentenced Mr. Johnson as a second-felony offender to eighty years at hard labor. This appeal followed.
 

 STATEMENT OF THE FACTS
 

 On the night of December 5, 2002, Louis Kaplan was severely beaten in his Algier’s apartment and left in a trash dumpster. Although he was still alive when the police found him, Mr. Kaplan died a few days later in the hospital. The forensic pathologist who performed the autopsy determined the cause of death to be blunt force trauma.
 

 On the night in question, the New Orleans Police Department (“N.O.P.D”) received several 911 calls concerning this crime. Gesielle Rousell, N.O.P.D. Assistant Communications supervisor, identified an audiotape of one of the 911 calls received on December 5, 2002, from the crime scene (3800 Texas Drive in Algiers). The caller (Keisha Price) said she was sleeping at her boyfriend’s apartment and woke up to find blood all over the apartment. The caller reported “two black males, no description given.” The caller further reported that she jumped out of the window, that her boyfriend possibly was injured inside, and that |4it was unknown if the subjects were still inside. The call was documented as a report of “unknown trouble.”
 

 N.O.P.D. Officer Richard Sasnett testified that he and his partner responded to the report of unknown trouble. In route to the scene, they were flagged down by a female (later identified as Ms. Price) about a block and a half from the apartment. Ms. Price was hysterical, hyperventilating, and having trouble communicating. After
 
 *1194
 
 the officers calmed her down, Ms. Price described the two suspects who beat up her boyfriend, Mr. Kaplan, as two black males. The first one was six feet tall, weighing one hundred and fifty pounds, and wearing a gray hooded sweatshirt. The second one was about five feet ten inches tall, weighing one hundred and eighty pounds, and wearing all dark clothing. Ms. Price also reported that the first one (the six foot tall individual) came into the bedroom where she was sleeping and that he had a gun.
 

 After speaking with Ms. Price, Officer Sasnett testified that they broadcast the information they obtained from her regarding the two suspects over the police radio and relocated to the apartment. Officer Sasnett entered the apartment, and his partner stayed in the police vehicle with Ms. Price. Officer Sasnett described the apartment as a very bloody scene and characterized it as probably one of the worst crime scenes he had ever seen. Explaining the layout of the apartment complex, Officer Sasnett stated that it was part of a four-plex with two apartments downstairs and two upstairs; Mr. Kaplan’s apartment was one of the upstairs apartments. There was a common entrance with stairs to the two upstairs | ¿apartments, and a foyer in between them. Officer Sasnett testified that they found a large pool of blood around the front steps of the apartment complex itself, bloody prints and splatters all the way up the common staircase leading up to Mr. Kap-lan’s apartment, and blood all over the front door of the apartment. He testified that “it was obvious that a big fight had taken place because the furniture had been knocked over and there was blood splattered all over the main room of the apartment.”
 

 On cross-examination, Officer Sasnett testified that the lights were on in the apartment when he arrived. He believed another unit had arrived before him and that the officers in that unit had gone to look for the victim. The victim, Mr. Kap-lan, was discovered in a dumpster fifty yards away from the apartment complex.
 

 N.O.P.D. Officer Brian Sullivan testified that his unit was the first one to respond to the report of unknown trouble. When he and his partner arrived at the apartment, the front door was open, the lights were on, but no one was inside. Large puddles of blood were on the carpet, and blood was spattered on the wall. Officer Sullivan decided to canvass the area and to attempt to locate a blood trail that would lead him to the bleeding victim. As he was exiting the apartment complex, an unidentified black male, who was standing across the street, flagged him down. Officer Sullivan characterized the man’s demeanor as that of a concerned witness. The unidentified man informed him that the victim’s body was in a dumpster and pointed him in the direction in which the suspects had fled.
 

 [(¡Officer Sullivan testified that he immediately relocated to the dumpster and heard a moaning noise. He looked inside the dumpster and observed several garbage bags and a white sock that appeared to have blood on it. When he removed the garbage bags, he observed a white male, who was in very bad condition. The victim had a large laceration on his throat, was badly beaten, and was wearing only his underwear and socks. Emergency Medical Service (“EMS”) and the New Orleans Fire Department arrived on the scene, flipped the dumpster on its side, and removed the victim. The victim was transported to the hospital where he died a few days later. Although Officer Sullivan returned to the spot where he had spoken to the unidentified witness ten minutes earlier, he was unable to find that witness.
 

 
 *1195
 
 N.O.P.D. Sergeant Keith Joseph, Sr., testified that he also responded to the report of unknown trouble. While he was taking a statement from Ms. Price at the crime scene, Sergeant Joseph was notified by other officers that two possible suspects had been detained. He instructed the officers to bring the suspects back to the scene so that the eyewitness, Ms. Price, could identify them. Describing the identification procedure, Sergeant Joseph testified that Ms. Price was seated in the rear of an unmarked police unit on the scene with a detective. The suspects were brought before her one-by-one and illuminated. Ms. Price identified them as the two individuals who beat up the victim, dragged him down the steps, and threw him into a dumpster. On cross-examination, Sergeant Joseph acknowledged that the suspects were in handcuffs at the time the identifications were made.
 

 N.O.P.D. Officer Edgar Baron responded to a call of suspicious activity— two subjects dumping a body in a dumpster on Texas Street. As he was in route to the scene, he spotted two men (later identified as Mr. Johnson and Mr. Kelson) that fit the description of the suspects that was broadcasted over the police radio. One man was dressed in dark clothing; the other man was dressed in sweatpants, a gray sweatshirt, and a dark headband. Officer Baron, who was in plainclothes, stopped his unmarked police unit and identified himself as a police officer. When he had the door of his vehicle open, the two men were near the front of his vehicle. At that point, Officer Baron was able to see their faces. The two men then fled. Officer Baron caught Mr. Johnson without ever losing sight of him. As he was returning to his vehicle with Mr. Johnson in custody, Officer Baron noticed the other man running in the back of an apartment complex. He also noticed that the other man had removed a garment of clothing (his top).
 

 The suspects were apprehended five to ten minutes after the initial broadcast of the incident and only four or five blocks away from the crime scene. Officer Baron drove Mr. Johnson back to the crime scene for an on-the-scene identification procedure. He displayed Mr. Johnson un-handcuffed outside the police car. Other officers illuminated Mr. Johnson with a spotlight. Following the identification, Officer Baron placed Mr. Johnson under arrest for aggravated battery and transported him to the detective’s division at the police station.
 

 At the police station, Mr. Johnson requested to use the restroom. Fearing Mr. Johnson might dispose of evidence in the restroom, Officer Baron performed 18an extremely thorough check of him. Officer Baron noticed that Mr. Johnson had wet blood on both of his shoes and socks, and seized those items. Officer Baron refreshed his memory with his notes regarding the conversation between him and Mr. Johnson that followed; he testified:
 

 The exact verbiage I was given was, “Please just let me go to the bathroom and clean my bloody shoes off’ — excuse me, “and clean the blood off my shoes. Nobody has to know.” He then advised me that the victim was a — he was a victim of the game and that he had to kill the individual known to him as Paco. He stated that “Paco was a player in the game and he tried to get out on a funny style so, I was ordered to do a hit on him by the man.” He went on to tell me that he was friends with Paco and that they grew up together and attended school together as kids. He additionally advised me that he had never been convicted of any crimes due to his connections with the FBI. Johnson stated that he could have any witnesses of his crime
 
 *1196
 
 killed by the man. Then he asked me to consider just hiding the shoes for the detectives and he would greatly reward me.
 

 Officer Baron also testified that when Mr. Johnson was apprehended he was wearing his sweatpants turned inside out. After Mr. Johnson’s clothing was taken from him at booking, his sweatpants were turned right-side out and what appeared to be blood was found on the exterior side. Once the detectives arrived and took custody of Mr. Johnson, Officer Baron left the office to check whether Mr. Kelson had the same type of substance on his clothing, which he believed to be blood. He learned that Mr. Kelson also had that same type of substance on his clothing. On cross-examination, Officer Baron testified that Mr. Johnson did not resist arrest.
 

 Officer Baron was questioned about errors in the listing of evidence on the police property room evidence list. One error was the failure to list Mr. Johnson’s shoes despite that the shoes were in the property room with other evidence in the case. A second error was the failure to list a key chain until nineteen days later; Officer Baron testified that the key chain may have been inside of a pocket where 13he did not notice it initially. A third error was the gray sweatshirt was listed as gray sweatpants, and a white headband was listed as white socks. Officer Baron denied adding any evidence into the Evidence and Property Room for the case.
 

 Former N.O.P.D. Homicide Detective Thomas Redmond testified that he worked on this case after Mr. Kaplan died. (The case was originally not a homicide case because Mr. Kaplan did not die until a few days after the crime occurred.) Detective Redmond stated that the police received three 911 calls on the night of the incident: one from Ms. Price, another from Marlene Taylor, and a third call from an unidentified caller. Ms. Taylor’s call was in reference to her son having seen part of the event at the Algiers apartment. Detective Redmond testified that he spoke with Ms. Taylor and that she relayed the part of the event that she had seen. She also relayed that her son, who alerted her to what was happening, had seen “a good bit of the event.” Ms. Taylor informed the police that her son had gone to Texas. Despite multiple attempts to reach Ms. Taylor’s son, Detective Redmond testified that they were unable to locate him. On cross examination, Detective Redmond acknowledged that in his report he indicated that there was a possibility of a third suspect. Detective Redmond testified that some time after the incident he took a recorded statement from Ms. Price. Given the date of birth Ms. Price gave him in her statement, he calculated that Ms. Price was fourteen years old at the time she gave her statement.
 

 Consistent with Detective Redmond’s testimony, Ms. Price testified that she was fourteen or fifteen years old at the time of the killing. She testified that at the time of the incident she was staying with her boyfriend, Mr. Kaplan, in his apartment. She had been staying with him for about one or two months and was pregnant with his child. On the night of the incident she was sleeping in the | inbedroom of Mr. Kap-lan’s apartment, and he was in the living room with some friends. A man (later identified as Mr. Kelson) awoke her, told her to sit down, and grabbed her by her throat when she did not. Mr. Kelson then left the room, went into the living room, and left the bedroom door cracked open. At some point thereafter, Ms. Price went into the hallway. Ms. Price testified that she was unable to see exactly what the men were doing to Mr. Kaplan, but she was able to see that there was blood all over the room. She testified that she saw
 
 *1197
 
 a man (later identified as Mr. Johnson) and Mr. Kelson had Mr. Kaplan pinned down on the sofa. Although the light was not on in the living room, she testified that the television was on and reflecting directly on the sofa where Mr. Kaplan was being beaten by Mr. Johnson and Mr. Kelson. Ms. Price testified that she saw Mr. Kap-lan get loose at one point and start pulling on the front door knob, trying to get out. His shirt was ripped up and full of blood. She also testified that she heard the two men tell Mr. Kaplan to take it like a man.
 

 Ms. Price described Mr. Johnson as wearing dark hooded clothing and Mr. Kel-son as a tall, brown, skinny man who was wearing dark clothing. Ms. Price stated that at one point when she was observing what was happening Mr. Johnson noticed her, and she was able to see his face. Ms. Price said that Mr. Johnson and Mr. Kel-son dragged Mr. Kaplan out of the apartment. She did not know what happened after that because once they left she ran, closed the door, and escaped through a window.
 

 After jumping out of the window, Ms. Price spotted two women walking out of another apartment; she used their phone to call the victim’s mother and 911. When the police arrived, Ms. Price testified that they put her in the rear of a police car. While seated in the police car, Ms. Price viewed Mr. Johnson and Mr. Kelson. |n She testified that the police had a light shining on the two men. She positively identified them by their clothing and their faces.
 

 On cross examination, Ms. Price testified that she did not recall testifying at an earlier hearing that she never left the bedroom during the time the victim was being beaten. When confronted with her testimony from an earlier hearing, when she said that she “didn’t come completely out of the bedroom,” Ms. Price replied that if she said it earlier it was true. Ms. Price also testified that the incident happened five years earlier and that she was unable to remember every detail, but she remembered the two men killing Mr. Kaplan. She testified that Mr. Johnson did most of the work because he was in the living room with Mr. Kaplan, and Mr. Kelson was in the bedroom with her. Ms. Price confirmed on redirect examination that she could see what was happening from where she was standing and that she never said there were more than two attackers.
 

 At trial, Ms. Price identified photographs of Mr. Kaplan’s apartment. She also positively identified Mr. Johnson as the man she saw pinning down the victim on the sofa and hitting the victim. When asked how certain she was that Mr. Johnson was one of the perpetrators, Ms. Price replied that she was a thousand percent certain.
 

 Lucia Kaplan, the victim’s mother, testified that on the night Mr. Kaplan was killed she received a call from Ms. Price. She and her husband went to the hospital that night. At the hospital, she recognized the body of her badly beaten son only by the tattoo on his arm. She knew Mr. Johnson and Mr. Kelson from the neighborhood. She testified that they used to hang around with her son.
 

 Dr. Mary Jo Wright was stipulated to be an expert in trauma and critical care. Dr. Wright testified that she was the attending trauma call surgeon who |12treated Mr. Kaplan at the hospital. According to Dr. Wright, Mr. Kaplan was comatose and his drug screen was negative. He had a large slash wound on his right neck, a footprint on his chest, was barely breathing, had no diastolic blood pressure, and had lost a lot of blood. His right eye was swollen completely shut. He had a nasal fracture and eye socket fracture, and his nose had to be packed to stop the bleeding. A CAT scan
 
 *1198
 
 of his brain revealed subdural hematomas and swelling. Dr. Wright said the head trauma was so severe that his brain essentially began to swell. Although a tube was placed to drain fluid from his brain, the swelling continued and he was pronounced dead.
 

 N.O.P.D. Crime Scene Technician Sidney Street testified that on December 5, 2002, he was called to the crime scene. Ms. Street identified her crime scene report, a number of photographs depicting the crime scene, and articles of evidence collected at the scene and other nearby locations. Two knives were collected in the grass outside the victim’s apartment building. Ms. Street testified that she was unable to lift fingerprints from either of the knives because of the items’ surfaces, the way the blood was smeared, and fluids on the knives. She did not recover any fingerprints from the scene because she determined that no suitable prints could be lifted.
 

 Former N.O.P.D. Criminalist Officer Joseph Taffaro testified that he tested clothing from Mr. Johnson and Mr. Kelson for the presence of blood. Blood was found on Mr. Johnson’s green jogging pants, red T-shirt, gray boxer shorts, gray socks, and right and left gray/black Nike tennis shoes. Blood was also found on Mr. Kel-son’s blue jeans, FUBU sweater, and blue boxer shorts. Officer Taffaro cut samples for testing from the foregoing blood stained articles of clothing and tennis shoes.
 

 1 iaAnne Montgomery, who was stipulated to be an expert in the field of molecular biology and forensic DNA, testified that she compared DNA found on the clothing of Mr. Kelson and Mr. Johnson to the victim’s DNA. DNA samples taken from the blood on Mr. Kelson’s blue jeans and his FUBU sweater were consistent with the victim’s DNA. However, DNA samples taken from the blood on one of Mr. Johnson’s gray/black Nike tennis shoes and on Mr. Johnson’s green jogging pants were both inconclusive, due to insufficient or excessively degraded DNA. The sample on Mr. Johnson’s clothing thus was unable to be tested. Ms. Montgomery explained that heat, humidity, moisture, and mildew cause DNA to degrade. She noted that the evidence could have been improperly stored or not fully air-dried.
 

 Dr. James Traylor was qualified by joint stipulation as an expert in the field of forensic pathology. He performed the autopsy on Mr. Kaplan’s body. He described the injuries to Mr. Kaplan’s head as severe. Mr. Kaplan also had multiple sharp force injuries, including sharp force defensive wounds and abrasions. Mr. Kaplan had various types of force injuries, but Dr. Traylor opined that the cause of his death was blunt force injuries, the mechanism being cerebral edema.
 

 ERRORS PATENT
 

 A review of the record for errors patent reveals none.
 

 ASSIGNMENT OF ERROR NUMBER ONE:
 

 Mr. Johnson argues that the trial court erred in denying his repeated objections regarding the conflict of interest presented by his defense counsel, Shelly Vix, which prevented him from having a fair trial. He contends that the conflict of interest began with the mingled and undefined joint representation of [ 14him and his co-defendant, Mr. Kelson, by Ms. Vix and another appointed attorney, John Fuller, who were both from the same office — the Orleans Indigent Defender Program (“O.I.D.P.”). This joint representation by two O.I.D.P. attorneys continued through all pre-trial proceedings and through the joint first trial of Mr. Johnson and Mr. Kelson. Mr. Johnson further claims that
 
 *1199
 
 he raised the conflict of interest issue three times before and during this second trial by
 
 pro se
 
 motions to quash. He still further claims that the trial court erred in ruling that the conflict of interest could be handled in post conviction proceedings.
 

 In support of his contention, Mr. Johnson points out that on January 30, 2007, Stephen Singer, Chief of Trials for the newly-created Orleans Defender Program (“O.D.P”), filed a Motion to Withdraw from Representing Mr. Johnson or Mr. Kelson. This motion was filed on behalf of any attorney employed by the O.D.P. and requested appointment of separate counsel independent of the O.D.P. In this motion, Mr. Singer stated that the two former O.I.D.P. appointed attorneys, Ms. Vix and Mr. Fuller, had a single case file and “flip flopped representation between both of the co-defendants [ (Mr. Johnson and Mr. Kel-son) ].” On February 12, 2007, the trial court granted the motion.
 

 After this motion was granted, the trial court appointed new counsel for both Mr. Johnson and Mr. Kelson. On April 24, 2007, Mr. Johnson’s appointed counsel filed a motion to sever. On June 11, 2007, Mr. Johnson’s motion to sever was denied. Although Mr. Johnson objected and gave notice of his intent to seek writs, no writ application was filed. The trial court then set the matter for a pretrial conference on December 21, 2007. On that date, Mr. Johnson’s appointed counsel’s motion to withdraw was granted, and Ms. Vix — who formerly was Mr. Johnson’s appointed counsel — -enrolled as his privately retained counsel.
 

 |iaOn January 16, 2008, the other defendant, Mr. Kelson, filed a motion to sever, alleging that Ms. Vix had a conflict of interest because she had previously been employed with O.I.D.P. and because she had acted as his counsel at certain pretrial proceedings which occurred before the first trial. On January 18, 2008, the trial court, over the State’s objection, granted Mr. Kelson’s motion to sever on the grounds that there had been a conflict because both attorneys had been from the same public defender’s office — O.I.D.P.— and that if either Mr. Johnson or Mr. Kelson were to testify, each would accuse the other. Although the State filed a writ application from that ruling, this court denied the State’s writ. Ms. Vix then represented Mr. Johnson as his retained counsel through his second trial. On appeal, Mr. Johnson contends that because of Ms. Vix’s prior joint representation as O.I.D.P. appointed counsel of him and Mr. Kelson there was a conflict of interest that prejudiced him.
 

 Joint representation is not
 
 per se
 
 illegal and does not violate the right to assistance of counsel under the Sixth Amendment to the U.S. Constitution or Article 1, Section 3 of the Louisiana Constitution unless it gives rise to an actual conflict of interest.
 
 State v. Kahey,
 
 436 So.2d 475, 484 (La.l983)(citing
 
 State v. Ross,
 
 410 So.2d 1388 (La.1982)). An actual conflict of interest is defined as follows:
 

 If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interest of the other client and the defendant is sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to his other client.
 

 Kahey,
 
 486 So.2d at 484-85 (quoting
 
 Zuck v. Alabama,
 
 588 F.2d 436, 439 (5th Cir. 1979)). Generally, “Louisiana courts have held that an attorney laboring under an actual conflict of interest cannot render effective legal assistance to the defendant she is representing.”
 
 State v. Cisco,
 
 01-2732, p. 16 (La.12/3/03), 861 So.2d 118, 129
 
 *1200
 
 (citing
 
 State v. Franklin,
 
 400 So.2d 616, 620 (La.1981)).
 

 In
 
 Cisco, supra,
 
 the Louisiana Supreme Court reversed a defendant’s capital murder conviction and death sentence due to the defendant’s attorney simultaneously representing the defendant, the lead deputy sheriff investigator in his case, and the deputy sheriffs wife. The attorney represented the deputy sheriff and his wife in a domestic matter. The State’s case against the defendant rested on the defendant’s multiple statements, nineteen of which were introduced at trial. The majority of the statements, certainly the most damning of them, were secured by the deputy sheriff alone or at his direction during the time the attorney represented both the defendant and the deputy sheriff. The Supreme Court held that defendant’s attorney “was necessarily confronted with an actual conflict of interest when she was called upon to cross examine her client [the deputy sheriff] ... at the trial of her other client, the defendant.”
 
 Cisco,
 
 01-2732 at pp. 20-21, 861 So.2d at 132.
 

 In this case, two O.I.D.P. attorneys-— Ms. Vix and Mr. Fuller — represented both Mr. Johnson and his former co-defendant, Mr. Kelson, at times during the pretrial proceedings leading up to their joint first trial. As a result, a potential conflict existed at the time of the first trial in this matter. On December 10, 2003, both Mr. Johnson and Mr. Kelson on the record waived any potential conflict in the joint representation by O.I.D.P. attorneys; however, there was no indication that independent counsel advised Mr. Johnson and Mr. Kelson of the possible risks associated with conflicted counsel. At this time of the waiver, Ms. Vix informed the trial court that she would advise the court of any conflicts if they were to later arise.
 

 |17At the January 18, 2008, hearing on Mr. Kelson’s motion to sever, the trial court questioned Ms. Vix about the waiver; she replied “that the Court was aware at that time of what the attorneys thought was a[sic] obvious conflict.” Ms. Vix also explained that she had represented Mr. Johnson, her present client, at the first trial. She averred that they had asked for a continuance of the trial and “pointed out that there was a conflict the day of trial” although there was no record, even in the minute entry, that this occurred. Upon further questioning by the trial court, Ms. Vix stated that neither Mr. Johnson nor Mr. Kelson testified at the trial and that the only inculpatory statement that was introduced came from Mr. Johnson (his own statement) and inculpated only him. As noted, the trial court ultimately granted Mr. Kelson’s motion to sever.
 

 In granting the motion to sever, the trial court never suggested to Ms. Vix that her representation of Mr. Johnson was either inappropriate or unethical. The trial court, however, at the same January 18, 2008, hearing appointed an independent attorney to discuss with Mr. Johnson the possibility of a conflict of interest arising from Ms. Vix representing him as his retained counsel. After consulting with the independent counsel, Mr. Johnson was sworn in and waived any apparent or possible conflict arising from Ms. Vix formerly representing Mr. Kelson in pretrial matters and the O.I.D.P. attorneys having a joint file.
 

 On December 10, 2008, the first day of Mr. Johnson’s retrial, the conflict of interest issue was raised again by Mr. Johnson in a
 
 pro se
 
 motion to quash his indictment. In his motion to quash, he alleged ineffective assistance of counsel due to an alleged conflict of interest from the beginning of the case. He claimed that the conflict of interest had severely prejudiced him, tainted the verdict at his first trial, and could only be repeated at his second trial. He
 
 *1201
 
 also alleged that due to the | ^passage of time between the crime and Hurricane Katrina he had been permanently and irreversibly prejudiced. Mr. Johnson argued that he had never had any meaningful defense and that effective counsel would have challenged more issues in his case. In denying Mr. Johnson’s motion to quash, the trial court stated:
 

 [Y]ou have been represented by separate counsel for this separate trial. Ms. Shelly [sic] was your attorney for the first trial and now she is your attorney for the second trial. Your co-defendant was represented by John Fuller and then later was represented by a different lawyer. So, I do not find that you have a conflict that would permanently and irreversibly prejudice your defense.
 

 The trial court further stated that the conflict of interest issue was not a ground for a motion to quash the indictment, but rather the conflict of interest issue was more properly raised post-trial. Mr. Johnson lodged an objection to the ruling.
 

 During the trial, the conflict of interest issue arose again in connection with an objection lodged, apparently by the State, regarding a former O.I.D.P. attorney, Suzanne LeVert, sitting at the defense table with Ms. Vix during trial. Mr. Johnson’s trial counsel, Ms.Vix, stated for the record that Ms. LeVert was not there to participate in the trial; rather, she was there to assist Ms. Vix who was trying the case alone. Ms. LeVert did not have a speaking role in the trial. Ms.Vix noted that she had informed the court about Ms. Le-Vert’s presence. The trial court responded that it was told Ms. LeVert would sit behind Ms. Vix, but Ms. LeVert was sitting next to Ms. Vix.
 

 The trial court addressed Mr. Johnson and asked him if he waived any conflict relating to Ms. LeVert’s presence at the defense table. Mr. Johnson responded that he had no conflict because it did not matter if it was Ms. Vix or another attorney he named, that it did not matter. He explained that it did not matter because his case had been damaged “beyond irreversible prejudice,” and |19thus it did not matter who represented him. Mr. Johnson further explained that “[t]hey’re behind me, you know, they’re doing a good job.” Quoting from his motion to quash, Mr. Johnson stated that even if two new attorneys without any conflict were appointed to represent him and Mr. Kelson, those two attorneys would be laboring under the severe handicap of the case being several years old. The trial court asked Mr. Johnson if he basically felt that the prejudice was beyond “fixing it,” and Mr. Johnson replied in the affirmative. The trial court stated that the conflict had been waived and asked Mr. Johnson if he understood that. Mr. Johnson replied in the affirmative.
 

 On appeal, Mr. Johnson contends that Ms. Vix took (or failed to take) certain steps in his defense because she had previously appeared on behalf of his former codefendant, Mr. Kelson. He points out that throughout the trial evidence pertaining to Mr. Kelson was admitted without Ms. Vix objecting despite the irrelevance of this evidence to Mr. Johnson’s case. For instance, results of the testing of Kel-son’s clothing for the victim’s DNA was admitted, and Ms. Price stated that she heard the victim call out only “Quani,” Mr. Kelson’s apparent nickname. Mr. Johnson contends that Ms. Vix should have attacked or dispelled the association between him and Mr. Kelson, but she was precluded from doing so due to her conflicting loyalty to Mr. Kelson. This line of reasoning is unpersuasive. Given that the State’s theory was that Mr. Johnson and Mr. Kel-son committed the crime together, the evi
 
 *1202
 
 dence against Mr. Kelson was relevant to the issue of Mr. Johnson’s guilt.
 

 Contrary to Mr. Johnson’s contention, the record does not reflect that Ms. Vix’s performance either during the pretrial proceedings leading up to the second trial or at the second trial was affected by her prior appearances on Mr. Kelson’s 12nbehalf before the first trial. In the proceedings leading up to the second trial, Ms. Vix reurged on Mr. Johnson’s behalf motions to suppress. At trial, Ms. Vix thoroughly cross examined the witnesses against Mr. Johnson. While Ms. Vix jointly represented both Mr. Kelson and Mr. Johnson at a motion to suppress hearing held before the first trial, most of her other appearances on behalf of Mr. Kelson were perfunctory. Thus, the record supports the trial court’s finding of no actual conflict of interest in Ms. Vix representing Mr. Johnson in connection with his second trial.
 

 Mr. Johnson cites
 
 Cisco, supra,
 
 for the proposition that a trial court has a duty to avoid a possible conflict of interest. He notes that in
 
 Cisco, supra,
 
 as in this case, the trial court was notified of the conflict. Mr. Johnson’s reliance on the
 
 Cisco
 
 case is misplaced. Unlike in
 
 Cisco, supra,
 
 in which there was an actual conflict of interest, as indicated above, no actual conflict of interest was presented in this case. Ms. Vix’s prior appearance on behalf of Mr. Johnson’s codefendant Mr. Kelson at the first trial did not affect her performance in representing Mr. Johnson at his second trial and the pretrial proceedings leading up to that trial.
 

 Mr. Johnson also cites Rule 1.9 of the Louisiana Rules of Professional Conduct, which provides that “[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or substantially related matter in which that person’s interest are materially adverse to the interest of the former client unless the former client gives informed consent, confirmed in writing.” Mr. Johnson, however, cites no authority for the proposition that a violation of an ethical rule is a ground for reversal of a defendant’s criminal conviction and sentence. The Louisiana Supreme Court has recognized, at least in civil cases, that the Rules of Professional Conduct have the effect of substantive law.
 
 See Succession of Cloud,
 
 530 So.2d 1146, 1150 (La. 1988). In this case, assuming
 
 arguendo
 
 that the Rules of Professional Conduct apply, as noted above, no actual conflict existed as to Ms. Vix’s representation of Mr. Johnson at his second trial and the pretrial proceedings leading up to that trial. Thus, even assuming that a violation of the ethical rules could constitute reversible error, any such error was harmless.
 

 Mr. Johnson also argues that the trial court erred in failing to comply with the dictates of La.C.Cr.P. art. 517. Article 517 imposes on a trial court an affirmative duty in cases of joint representation to advise the defendant of the right to conflict-free representation. La. C.C.P. art. 517, Comment (b). This court has construed Article 517 as strictly a procedural vehicle designed “to lessen the possibility that after conviction a jointly-represented defendant will assert a claim that his counsel was not conflict-free and thus was ineffective.”
 
 State v. Miller,
 
 00-0218 (La.App. 4 Cir. 7/25/01), 792 So.2d 104, 113-15. This court also has held that a trial judge’s failure to comply with Article 517 does not rise to a denial of a constitutional right and that such a failure is subject to a harmless error review.
 
 Id.
 

 Under the facts of this case Article 517 does not apply. Mr. Johnson and Mr. Kelson were not jointly represented by the same counsel or by counsel associated in the practice of law in their second trial or in the proceedings leading up to it. Any
 
 *1203
 
 effect of the prior representation at the first trial and in the pretrial proceedings leading up to the first trial was addressed by the trial court; hence, the trial court effectively complied with the article. Regardless, the failure of a trial court to follow La.C.Cr.P. art. 517 is subject to harmless error review.
 
 Miller, swpra.
 
 Considering the facts and circumstances of the instant case, even assuming
 
 arguendo
 
 the trial court failed to fulfill its duty under La.C.Cr.P. art. 517, the 122guilty verdict rendered in the instant case was not attributable to such lapse. There is no merit to this assignment of error.
 

 ASSIGNMENT OF ERROR NUMBER TWO
 

 Mr. Johnson next contends that the trial court erred in denying his two motions for mistrial under La.C.Cr.P. art. 775 upon learning on the second day of trial that three jurors read articles (or headlines) in the
 
 Times-Picayune
 
 newspaper concerning his case headlined “Man on Trial Again in Beating Death” and “2002 Retrial.” He contends that the impact of the newspaper articles tainted the jury, particularly since the trial court judge supplied the jury with the newspaper, and that it was an abuse of discretion for the trial court to deny his mistrial motions. The State counters that the trial court sufficiently determined that the jurors who were exposed to the news articles were not so impressed by it as to be incapable of rendering a fair and impartial verdict. The State further counters that the trial court took adequate measures to ensure that the publicity did not taint the jury.
 

 A mistrial is mandatory when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial. However, a mistrial is a drastic remedy that should only be declared upon a clear showing of prejudice by the defendant.
 
 State v. Leonard,
 
 05-1382, p. 11 (La.6/16/06), 932 So.2d 660, 667. The mere possibility of prejudice is insufficient to warrant a mistrial.
 
 Id.
 
 “The determination of whether actual prejudice has occurred, and thus whether a mistrial is warranted, lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion.”
 
 State v. Wessinger,
 
 98-1234, p. 24 (La.5/28/99), 736 So.2d 162, 183.
 

 The test for determining whether a mistrial should be granted upon a showing that the jurors have read a newspaper article regarding the matter on trial [ ^depends upon “whether or not a fair trial, under the circumstances, has been interfered with.” Andrea G. Nadel,
 
 Juror’s reading of newspaper account of trial in state criminal case during its progress as ground for mistrial, new trial, or reversal,
 
 46 A.L.R.4th 11 (1986). “There is not one rule, however, which defines just what does or does not so interfere. The inquiry, therefore, must center primarily around the facts in each case, and the ultimate decision rests in the sound discretion of the court.”
 
 Id.; see also Marshall v. United States,
 
 360 U.S. 310, 312, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959)(noting that a trial court has great discretion in ruling on the issue of prejudice in such a case, and “[generalizations beyond that were not profitable, because each case must turn on its special facts.”)
 

 Although under La.C.Cr.P. art. 775 prejudicial conduct may include pretrial or midtrial publicity, a mistrial is not warranted “absent a determination that the jurors were actually exposed to the publicity in question and were so impressed by it as to be incapable of rendering a fair and impartial verdict.”
 
 State v. Banks,
 
 96-2227 at pp. 2-3 (La.4/18/97), 692 So.2d 1051, 1053 (quoting
 
 State v. Russell,
 
 416 So.2d 1283, 1290 (La.1982)).
 

 
 *1204
 
 In
 
 Banks, supra,
 
 the Louisiana Supreme Court reinstated the trial court’s ruling denying the defendant’s motion for a mistrial because of the jurors being exposed to a newspaper article and reversed the appellate court’s contrary decision. In that case, jury selection was completed in the defendant’s trial for aggravated crime against nature, and the court recessed trial overnight in Alexandria, Louisiana. The following morning the
 
 Alexandria Daily Town Talk
 
 newspaper printed an article containing general information about the charges against the defendant and the trial, as well as references to other, pending, similar charges against the defendant In New Orleans. In response to questioning by defense ^counsel, two jurors indicated they had read the entire article, but said they could put aside what they had read and consider only the evidence presented at trial in determining the defendant’s guilt. A third juror did not read the entire article; he stopped reading when he discovered it was about the defendant, stating that he did not want to know anything more. The trial court denied the defendant’s motion for a mistrial on the ground that the two individuals who had read the article would be able to put it aside and decide the defendant’s innocence or guilt strictly on the facts of the case. The trial court was not satisfied that the jurors were tainted to the point that they could not separate it and sit and listen to the evidence and the testimony to be presented. In finding the trial court did not abuse its discretion, the Supreme Court relied upon the following three factors: (i) the two jurors’ emphatic and unequivocal assurances of continuing impartiality; (ii) the content of the newspaper article, which referred to accusations of other similar crimes but not to convictions; and (iii) the absence of any evidence that information in the news article infected the entire jury panel and became a topic of general discussion.
 
 Banks,
 
 96-2227 at p. 4, 692 So.2d at 1053-1054.
 

 In this case, on the morning of the second day of trial (December 11, 2008), the trial court judge herself gave the jurors the
 
 Times-Picayune
 
 newspaper for that day. Explaining what occurred and taking full responsibility for it, the trial judge stated: “the Judge put her newspaper, the New Orleans edition in with the jury because they were waiting an hour and half for us to start and I had reviewed the paper and did not see the little article on B-3.” The article on B-3 of the Metro section of the New Orleans edition, the judge noted, contained a “very tiny article to the left of the page that said, ‘Man on Trial Again in Beating Death.’ ” Upon discovering the mistake, the judge questioned the jurors individually, and three of lajthem — Mr. Ward, Mr. Knight and Mr. Anderson — -admitted seeing the article either in the paper provided by the court or on their own. The court then further questioned those three jurors together, but out of the presence of the rest of the panel.
 

 Mr. Knight stated that he saw the headline. He also testified that he was skimming the first part of an article about a different trial that the same trial judge had handled the day before, and the judge’s name caught his attention. He then flipped back to the first page of the article, saw the headline about a retrial, and stopped reading because he did not want to have any bias. The trial judge asked Mr. Knight if there was anything in the article he read that would affect his ability to predetermine the case. Mr. Knight replied, “No, your Honor.”
 

 Mr. Ward testified: “[I] just saw the headline and I saw the date, 2002 and the other day, the prosecution said the case was from 2002 so, with that, I stopped. I did not read the article.” In response to the trial judge’s question of whether there
 
 *1205
 
 was anything that he read that would affect his ability to predetermine the case, Mr. Ward replied that nothing would have changed his opinion, and that he was judging the case based upon what was presented during the trial.
 

 Mr. Anderson, one of two attorney members of the jury panel, testified that he, “same as Mr. Ward, I had the westbank edition and it was a big headline that said, ‘Retrial 2002.”’ Mr. Anderson further testified that he did not read any of the article; however, his impression was that it was a retrial. In response to the trial judge’s question of whether there was anything that he read that would affect his ability to predetermine the case, Mr. Anderson replied in the negative. When asked whether there was anything in the headline he read that would affect his | gr,being fair and impartial and not making a decision until he heard all the evidence, Mr. Anderson replied: “Absolutely not.”
 

 After questioning the three jurors, the trial court ruled that the jurors were “sufficiently un-effected [ (sic) ] and that they can continue as jurors in this case.” The three jurors were then returned to the jury room, and Mr. Johnson’s counsel moved for a mistrial based on prejudice under La.C.Cr.P. art. 775, which the trial court denied. In so doing, the trial court reasoned as follows:
 

 This Court reviewed the New Orleans edition of the paper and did not see that article and when I went into the jury this morning to see if all of them were there, to make sure that no one had read the paper. The one westbank juror [Mr. Knight] said, “there is an article in the westbank paper but I did not read it.” That same juror then brought it up when I instigated the questioning.
 

 The judge noted that the westbank edition of the paper for that same day — the second day of trial, Thursday, December 11th — contained an article entitled “Retrial Today in 2002 Killing, Original Transcripts Lost in Flood.” Insofar as Mr. Knight, the judge offered to allow defense counsel to question him regarding his violating the judge’s admonition regarding not reading the paper, and defense counsel declined the invitation to do so. The judge further noted that Mr. Knight was the only juror who had done so. The judge also stated that “reading a ‘Retrial Today in 2002 Killing’ and ‘Man on Trial Again in Beating Death’ and ‘Manslaughter’ is not prejudicial.” The judge stressed that the three jurors said they could be fair, that they did not read the article, and that neither of the articles — the one in the New Orleans edition or the one in the westbank edition— provided any information that would not be brought out at trial. The judge still further pointed out that defense counsel brought up in questioning the 911 witness her having testified in this case before. The court thus found that “any mention of 127Prior trials, the jury could just as easily think that a retrial is because the co-defendant has been tried and that this is a trial of this defendant.” The trial court also denied Mr. Johnson’s subsequent mistrial motion.
 

 Considering the three jurors’ responded on examination by the trial court that they could be fair, the circumstances of this case under which the jurors were exposed to the newspaper articles, and the content of those articles, it cannot be said that the trial court abused its discretion in determining that the jurors would remain impartial and decide the case solely on the evidence presented at the retrial.
 

 ASSIGNMENT OF ERROR NUMBER THREE
 

 Mr. Johnson argues that the trial court erred in denying his motion to suppress Ms. Price’s identification of him. He contends that the identification procedure
 
 *1206
 
 was suggestive. He points out that the police told Ms. Price, who was seated in the rear of a police car, that they were bringing two boys that they had caught for her to identify them. The police brought Mr. Johnson along with Mr. Kelson in handcuffs, despite contrary police procedures. The police then illuminated Mr. Johnson. Mr. Johnson stresses that Ms. Price was very young and in an emotionally charged situation. He claims that anyone the police brought along with Mr. Kel-son, who choked and threatened Ms. Price, was likely to be identified by her.
 

 A trial court’s determination of the admissibility of identification evidence is entitled to great weight and will not be disturbed on appeal absent an abuse of discretion.
 
 State v. Offray,
 
 00-0959, p. 5 (La.App. 4 Cir. 9/26/01), 797 So.2d 764, 769 (citing
 
 State v. Bickham,
 
 404 So.2d 929, 934 (La.1981)). One-on-one identifications generally are not favored, although such identification procedures are permissible under certain circumstances.
 
 State v. Nelson,
 
 08-0584, pp. 5-6 (La.App. 4 Cir. 12/17/08),28 3 So.3d 57, 60-61. “[0]ne-on-one identifications are justified when the accused is apprehended within a relatively short period of time after the occurrence of the crime and when the accused has been returned to the scene for immediate identification.”
 
 Id.
 
 In that
 
 context,
 
 an “immediate confrontation assures the reliability of the identification as the perpetrator’s appearance is fresh in the witness’ mind, lessens the possibility that the perpetrator’s clothes or appearance will be changed, and insures early release of innocent subjects.”
 
 Id.
 

 Mr. Johnson had the burden of proving that the one-on-on identification of him was suggestive and that there was a substantial likelihood of misidentifieation as a result of the identification procedure.
 
 See State v. Ballett,
 
 98-2568, p. 17 (La. App. 4 Cir. 3/15/00), 756 So.2d 587, 597;
 
 State v. Martello,
 
 98-2066, p. 8 (La.App. 4 Cir. 11/17/99), 748 So.2d 1192, 1198. An identification procedure is suggestive if it focuses attention on the defendant.
 
 State v. Laymon,
 
 97-1520, p. 16 (La.App. 4 Cir. 3/15/00), 756 So.2d 1160, 1172. However, even a suggestive out-of-court identification will be admissible if found to be reliable under the totality of the circumstances.
 
 Id.; Nelson,
 
 08-0584 at p. 6, 3 So.3d at 61.
 

 The factors to be considered in determining whether an identification, even if made under suggestive circumstances, is reliable include: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness’s degree of attention; (3) the accuracy of the witness’s prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation.
 
 Manson v. Brathwaite,
 
 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977);
 
 State v. Green,
 
 98-1021, p. 12 (La.App. 4 Cir. 12/22/99), 750 So.2d 343, 350.
 

 |2flMr. Johnson contends that an analysis of the
 
 Manson
 
 factors establishing the identification was not reliable. First, he notes Ms. Price only saw Mr. Kaplan’s attacker when she looked out of the bedroom door into the dark living room; the living room was lit only by the television. He was wearing a hood and looking down at the sofa. Second, Mr. Johnson notes that Ms. Price was frightened and agitated and admittedly did not pay attention to details. Third, she was unable to give a description to the 911 operator. Moreover, the clothing description Ms. Price gave to police did not match the clothing that Mr. Johnson was wearing when he was arrested, green pants and a red shirt, not dark colors. Also, he was wearing a
 
 *1207
 
 distinctive head band that she would have noticed had she seen his face.
 

 The State counters that analysis of the
 
 Manson
 
 factors establishes the identification was reliable. First, the State notes that Ms. Price had ample opportunity to view Mr. Johnson while he was in the apartment. Although the lights were off, she testified that she was able to see his face because of the light coming from the television. Second, moments after the incident Ms. Price gave the police a detailed description of the two men including their age, height, weight, race, and gender. Third, Ms. Price’s description was accurate. Fourth, she testified that she was one thousand percent certain that Mr. Johnson was one of the two men she saw beating the victim. Finally, Ms. Price identified Mr. Johnson a relatively short time after she observed the commission of crime when he was brought back to the scene for the one-on-one identification.
 

 Considering all of the
 
 Manson
 
 factors and weighing them against any corrupting effect of the arguably suggestive identification, we cannot conclude that the trial court abused its discretion in finding Ms. Price’s identification of Mr. [^Johnson reliable under the totality of the circumstances. The trial court thus did not err in denying Mr. Johnson’s motion to suppress that identification.
 

 ASSIGNMENT OF ERROR NUMBER FOUR
 

 Mr. Johnson’s final assignment of error has three parts, which all relate to sentencing. He alleges the trial court erred in the following three respects: (i) imposing upon him an unconstitutionally excessive eighty-year sentence; (ii) sentencing him to a greater sentence than he received after his first trial and conviction; and (iii) adjudicating him a second-felony habitual offender. We separately address each of these arguments.
 

 (i) Excessive Sentence
 

 Mr. Johnson contends that his eighty-year sentence for manslaughter as a second-felony habitual offender is unconstitutionally excessive. He contends that there is nothing in the record to support the imposition of the maximum sentence on him.
 

 In reviewing a claim that a sentence is excessive, the only relevant question is “whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.”
 
 State v. Cook,
 
 95-2784, p. 3 (La.5/31/96), 674 So.2d 957, 959 (quoting
 
 State v. Humphrey,
 
 445 So.2d 1155, 1165 (La.1984));
 
 State v. Soraparu,
 
 97-1027 (La.10/13/97), 703 So.2d 608. For sentences falling within the range provided by the Legislature, a trial court abuses its discretion only when it contravenes the constitutional prohibition of excessive punishment set forth in La. Const, art. I, § 20, which prohibits “punishment disproportionate to the offense.”
 
 State v. Sepulvado,
 
 367 So.2d 762, 767 (La.1979).
 

 | S|A sentence is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly disproportionate to the severity of the crime.
 
 State v. Johnson,
 
 97-1906, pp. 6-7 (La.3/4/98), 709 So.2d 672, 677. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice.
 
 State v. Baxley,
 
 94-2982 (La.5/22/95), 656 So.2d 973, 979. Even a sentence within the statutory limits can violate a defendant’s constitutional right against excessive punishment.
 
 State v. Brady,
 
 97-1095, p. 17 (La.App. 4 Cir. 2/3/99), 727 So.2d 1264, 1272. Howev
 
 *1208
 
 er, “[c]ourts must apply these [legislatively defined] penalties unless they are found to be unconstitutional.”
 
 Baxley,
 
 94-2982 at p. 10, 656 So.2d at 979.
 

 In reviewing an excessive sentence claim, an appellate court generally must determine whether the trial judge has adequately complied with statutory guidelines in La.C.Cr.P. art. 894.1.
 
 State v. Trepagnier,
 
 97-2427, p. 11 (La.App. 4 Cir. 9/15/99), 744 So.2d 181, 189;
 
 State v. Robinson,
 
 98-1606, p. 12 (La.App. 4 Cir. 8/11/99), 744 So.2d 119, 127. Nonetheless, this court has noted that “[t]he articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions.”
 
 State v. Major,
 
 96-1214, p. 10 (La.App. 4 Cir. 3/4/98), 708 So.2d 813, 819. If adequate compliance with La. C.Cr.P. art. 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of the case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged.
 
 State v. Ross,
 
 98-0283, p. 8 (La.App. 4 Cir. 9/8/99), 743 So.2d 757, 762;
 
 State v. Bonicard,
 
 98-0665, p. 3 (La.App.4 Cir. 8/4/99), 752 So.2d 184, 185. An appellate court shall not set aside a sentence for excessiveness if the record supports the sentence the trial court imposed. La.C.Cr.P. art. 881.4(D).
 

 Mr. Johnson was convicted of manslaughter, and the trial court sentenced him as a second offender to serve eighty years at hard labor, the maximum sentence he could receive.
 
 See
 
 La. R.S. 14:31(B); 15:529.1 A(lXa).
 
 [1]
 
 The victim’s mother, Lucia Kaplan, gave a victim impact statement at trial. She testified that her life will never be the same, and that she could never forgive Mr. Johnson. She stated that in her sleep she sees images of what Mr. Johnson and his accomplice did to her son. The State also introduced into evidence a victim impact letter written by the victim’s brother, which the trial judge stated she had read.
 

 In sentencing Mr. Johnson to the maximum forty-year sentence for the manslaughter conviction, the trial court stated that it had considered the sentencing guidelines of La.C.Cr.P. art. 894.1, and found Mr. Johnson was in need of incarceration. The trial court cited the following reasons for the sentence it imposed:
 

 • Mr. Johnson’s conduct during the commission of the crime manifested deliberate cruelty to the victim and created a risk of death or great bodily harm to more than one person, including Ms. Price, who jumped from a second floor window.
 

 • Mr. Johnson used threats of or actual violence in the commission of the offense, specifically in the manner and mode of death, which the court found excessive; the court referred to the beating and multiple stab wounds.
 

 • The offense resulted in a significant permanent injury or significant economic loss to the victim or his family; the victim would never see his |,gSchild, referring to Ms. Price being pregnant with the victim’s child at the time of his death.
 

 • Mr. Johnson used a dangerous weapon in the commission of the offense, mentioning a knife and a boot.
 

 • Mr. Johnson was a leader or his violation was in concert with one or more persons; the court referred to Mr. Johnson telling the victim to “take it
 
 *1209
 
 like a man” as he was being beaten to death and stabbed repeatedly.
 

 After Mr. Johnson was adjudicated a second-felony habitual offender and was being re-sentenced as a multiple offender, the trial court stated that it was sentencing him to eighty years at hard labor for the reasons stated in the court’s original sentencing, which are outlined above. The trial court’s reasons for sentencing show more than adequate compliance with La. C.Cr.lP. art. 894.1. Thus, this court must compare Mr. Johnson’s sentence to those imposed in similar cases to determine if the court abused its discretion by imposing an excessive sentence.
 

 This court has repeatedly upheld maximum forty-year sentences for manslaughter imposed on first offenders.
 
 See State v. Colbert,
 
 07-0947 (La.App. 4 Cir. 7/23/08), 990 So.2d 76 (defendant lay in wait and shot the man accompanying his ex-girlfriend);
 
 State v. Nix,
 
 07-1431 (La.App. 4 Cir. 6/18/08), 987 So.2d 855 (the defendant stabbed one man to death and critically injured another man);
 
 State v. Allen,
 
 06-1434 (La.App. 4 Cir. 3/7/07), 954 So.2d 779 (the defendant, who had prior convictions, stabbed someone whom he thought had stolen his wallet);
 
 State v. Bell,
 
 02-2349 (La.App. 4 Cir. 8/6/03), 854 So.2d 429 (the defendant, who had no prior convictions, stabbed her lover; she had been charged with second degree murder);
 
 State v. Jones,
 
 01-0630 (La.App. 4 Cir. 3/20/02), 814 So.2d 623 (the ^defendant, charged with second degree murder, was convicted of manslaughter in the shooting death of a man with whom he had fought earlier the same night); and
 
 State v. Williams,
 
 99-2355 (La.App. 4 Cir. 12/13/00), 776 So.2d 604 (the defendant, charged with first degree murder, was convicted of manslaughter when he opened fire in the apartment of a man with whom he had previously fought).
 

 Mr. Johnson, however, was sentenced to the maximum sentence of eighty years as a second offender. This court upheld an eighty-year sentence imposed for a conviction for manslaughter as a second offender in
 
 State v. Walker,
 
 99-2868 (La.App. 4 Cir. 10/18/00), 772 So.2d 218. In
 
 Walker, supra,
 
 the defendant confessed to strangling a woman with whom he had smoked crack and had sex, after she allegedly began hitting and pushing him when he informed her he had no more money or crack. The defendant was tried for second-degree murder, but the jury found him guilty of the lesser offense of manslaughter. The defendant’s only prior conviction was for theft valued at more than five hundred dollars. However, he had a lengthy history of arrests, including seven prior arrests for assault offenses. In addition, family members expressed fear about the defendant’s character insofar as his ability to inflict bodily harm. Finally, the defendant’s sister told police in connection with another incident that he had a tendency to fight women and that he confessed to her that he had killed his own grandmother.
 

 Other cases in which this court upheld maximum sentences as second offenders occurred before the maximum sentence for manslaughter was raised from twenty-one to forty years. This court upheld forty-two-year sentences as | ^second offenders in
 
 State v. Kelly,
 
 92-2446 (La.App. 4 Cir. 7/8/94), 639 So.2d 888, in which the defendant shot at one person whom he had tried to kill before and hit an innocent bystander; and in
 
 State v. Brown,
 
 452 So.2d 790 (La.App. 4 Cir.1984), in which the defendant had a running dispute with the victim over some jewelry, saw him in a bar, went outside to get and load a gun, returned to the bar, and shot the victim four times. Likewise, the First Circuit upheld a forty-two-year sentence in
 
 State v. Mickey,
 
 604 So.2d 675 (La.App. 1 Cir.1992), in which
 
 *1210
 
 the defendant shot the victim in the head during an armed robbery.
 

 In this case, Mr. Johnson was one of two men who viciously beat and stomped the victim, fatally wounding him and discarding him in a dumpster. Although Mr. Johnson had a prior conviction, his prior criminal record apparently was not as extensive as the defendant in
 
 Walker, supra.
 
 Nonetheless, the circumstances of the killing in this case were much worse than those in the other cases cited above, in which maximum sentences as second offenders were upheld, even though the maximum sentence available at the time of those offenses was forty-two years, almost half of the sentence the appellant received. The Legislature saw fit to almost double the maximum sentence for manslaughter, and we cannot conclude that the resulting increase of the maximum sentence for a second offender is constitutionally excessive in this case. Although the sentence imposed on Mr. Johnson is severe and there is no indication that he has a lengthy prior record or record of violent offenses, it cannot be said that the sentence is nothing more than the purposeless imposition of pain and suffering or is grossly | ^disproportionate to the severity of the crime. The record supports the sentence imposed by the trial court. We thus find no abuse of the discretion in the trial court’s imposing the maximum eighty year sentence.
 

 (ii) More Onerous Sentence at Resen-tencing
 

 Mr..Johnson next argues that the trial court erred in sentencing him to a more onerous sentence than he received after his first trial and conviction.
 

 Mr. Johnson’s argument is based on
 
 North Carolina v. Pearce,
 
 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), in which the Supreme Court held that when a judge imposes a greater sentence after a retrial, there is a presumption that the greater sentence is the product of vindictiveness unless the court sets forth reasons for the increase, based upon “objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding.”
 
 Pearce,
 
 395 U.S. at 726, 89 S.Ct. 2072. The Supreme Court’s ruling was based on the possibility that a trial court would increase a defendant’s sentence after retrial in retaliation for the defendant having appealed his first conviction, resulting in a chilling effect on a defendant’s due process right to appeal.
 

 The holding in
 
 Pearce
 
 was limited in
 
 Chaffin v. Stynchcombe,
 
 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973), in which the Supreme Court found that the imposition of a greater sentence by a different jury after retrial did not violate the defendant’s due process rights. The Supreme Court noted that because the jury that imposed the greater sentence was not the same jury that imposed the original sentence, the second jury had no personal stake in the prior conviction and sentence, and thus vindictiveness could [ ;wnot be presumed solely because the second jury imposed a greater sentence. The Supreme Court reasoned:
 
 “Pearce
 
 was not written with a view to protecting against the mere possibility that, once the slate is wiped clean and the prosecution begins anew, a fresh sentence may be higher for some valid reason associated with the need for flexibility and discretion in the sentencing process. The possibility of a higher sentence was recognized and accepted as a legitimate concomitant of the retrial process.”
 
 Chaffin,
 
 412 U.S. at 25, 93 S.Ct. 1977. The Court also rejected the defendant’s claim that his due process rights had been violated even in the absence of vindictiveness because he was exposed to a
 
 *1211
 
 greater sentence, thereby casting a chilling effect on his right to appeal. “To the contrary, the Court [in
 
 Pearce
 
 ] intimated no doubt about the constitutional validity of higher sentences in the absence of vindictiveness despite whatever incidental deterrent effect they might have on the right to appeal.”
 
 Chaffin,
 
 412 U.S. at 29, 93 S.Ct. 1977.
 

 The holding in
 
 Pearce
 
 was further limited in
 
 Texas v. McCullough,
 
 475 U.S. 134, 106 S.Ct. 976, 89 L.Ed.2d 104 (1986), in which, pursuant to the defendant’s election, a jury imposed a sentence after his first conviction. The trial court granted the defendant’s new trial motion, and on retrial the defendant was convicted of the same offense. The defendant elected to have the court sentence him, and the court imposed a greater sentence. The court gave findings of fact for the greater sentence, which included facts not elicited at the first trial. The court also noted that had it imposed the first sentence, it would have imposed a greater sentence than the jury did. On review, the Supreme Court found no presumption of vindictiveness in that the trial court |aRgranted the defendant his new trial. The Supreme Court noted that the defendant chose to be re-sentenced by the trial court, and thus a different entity imposed the second sentence. Nonetheless, the Supreme Court noted: “Where the prophylactic rule of
 
 Pearce
 
 does not apply, the defendant may still obtain relief if he can show actual vindictiveness upon resentencing.”
 
 McCullough,
 
 475 U.S. at 138, 106 S.Ct. 976. Because there was new evidence not elicited at the first trial that supported the increased sentence, the Supreme Court found that the defendant failed to show that the imposition of the greater sentence constituted vindictiveness.
 

 The holding in
 
 Pearce
 
 was still further limited in
 
 Alabama v. Smith,
 
 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989). The defendant had received a sentence in exchange for a guilty plea that he subsequently successfully had vacated. He went to trial, and after his conviction the court imposed a greater sentence. The Supreme Court found that the imposition of the greater sentence after trial did not violate the defendant’s due process rights despite that the same judge imposed both the earlier sentence and the greater sentence after trial. The Supreme Court noted that after trial the judge would have more information upon which to base the sentence. The Supreme Court remanded the case for consideration of the defendant’s claim that he could prove actual vindictiveness.
 

 Our research revealed no published cases in which this court has considered the claim at issue with respect to an increased second sentence that was imposed by a different trial judge. In
 
 State v. Howard,
 
 02-2435 (La.App. 4 Cir. 3/19/03), 843 So.2d 439, the same judge imposed a slightly greater sentence after remand |a9from this court. This court vacated the defendant’s sentence and remanded for re-sentencing because the judge did not set forth reasons for the increased sentence. In
 
 State v. Bertrand,
 
 04-1496 (La.App. 4 Cir. 12/15/04), 891 So.2d 752, this court found no Pearce violation when the same judge imposed a greater sentence on remand because the original sentence was illegally lenient.
 

 In
 
 State v. Morgan,
 
 08-1299 (La.App. 5 Cir. 5/26/09), 15 So.3d 1026, the court found that even though the presumption of vindictiveness did not apply because the judge who imposed the greater sentence was not the same one who imposed the original sentence, the defendant may be entitled to relief from the greater sentence if he affirmatively proves actual vindictiveness. The court noted that because vindic
 
 *1212
 
 tiveness is not presumed, the burden shifts to the defendant to show that the reason for the greater sentence is a product of vindictiveness and not based on other considerations.
 

 In so holding, the
 
 Morgan
 
 court discussed
 
 State v. Rodriguez,
 
 550 So.2d 837 (La.App. 2 Cir.1989), in which the court upheld the increased sentence because it was based on new, objective information concerning the defendant’s prior criminal record that was not available to the first sentencing judge, thus defeating any claim of vindictiveness. The
 
 Morgan
 
 court also discussed
 
 State v. Neville,
 
 572 So.2d 1161 (La.App. 1 Cir.1990), in which the defendant was originally convicted on two counts and given a total term of thirty-five years. On review, a federal court found a double jeopardy violation, dismissed one of the counts, and remanded the case. A different judge then imposed a thirty-four-year sentence on the remaining |4(lcount, indicating that he did so to be consistent with the original sentencing judge’s intention that the defendant serve thirty-five years imprisonment. The appellate court found that because no -vindictiveness could be presumed, the second judge did not need to consider the defendant’s intervening conduct or state any reasons for the greater sentence except those necessary under La.C.Cr.P. art. 894.1 to support the sentence.
 

 The
 
 Morgan
 
 court also looked at
 
 State v. Garrett,
 
 08-1752 (Ohio App. 2 Dist. 4/11/08), 2008 WL 1115246, in which the court found that vindictiveness was established because there was nothing in the record to support the imposition of the harsher sentence; the facts of the case and of the defendant’s circumstances had not changed; the increase was substantial; and the State did not recommend the greater sentence. The
 
 Morgan
 
 court also cited
 
 U.S. v. Anderson,
 
 440 F.3d 1013 (8th Cir.2006), in which the court found that the increased sentence, imposed by a different judge, was based on the second judge’s views that were unrelated to the prior appeal.
 

 After considering these cases, the
 
 Morgan
 
 court found a complete absence in the record before it of any relevant facts elicited after the first sentencing that would justify the greater sentences, which because they were to be served consecutively increased the total years served dramatically. The court noted that the second judge commented that he had “unbridled discretion” to impose the increased sentence. The court concluded:
 

 We note it is possible, based on the record, that the trial judge may not have had a personal animus against defendant, but rather, he may have [41thought concurrent sentences were too lenient considering the disturbing facts of this case, that defendant raped his own biological daughter numerous times over a period of years. However, since the trial court did not provide reasons for the increased sentence on remand after appeal, we vacate defendant’s enhanced sentence and remand this matter to the trial court for resentencing with orders that the trial court provide reasons for the sentence imposed.
 

 Morgan,
 
 08-1299 at p. 10, 15 So.3d at 1031-1032.
 

 On remand, the same judge re-imposed the same sentence on one count but increased the sentence on the second count by five years and again ordered that the sentences be served consecutively. On review, the appellate court upheld the sentences, finding that the court set forth sufficient reasons for the sentence, which was fifteen years greater than the original sentence.
 
 State v. Morgan,
 
 09-0694 (La. App. 5 Cir. 2/23/10), 34 So.3d 909. The court also noted that because the judge
 
 *1213
 
 who imposed the most recent sentence was not the same judge who imposed the original sentence, there was no presumption of vindictiveness, and the defendant had the burden of showing that the greater sentence was the product of vindictiveness. The court found that the defendant did not meet this burden because the judge set forth sufficient reasons for his increase of the sentence, including the fact that the original sentence on one of the counts was illegally lenient.
 

 After his first conviction, Mr. Johnson was sentenced to the maximum sentence for manslaughter, forty years at hard labor. After being adjudicated a second-felony habitual offender, the trial court vacated the original sentence and resen-tenced Mr. Johnson to fifty years at hard labor (the maximum sentence for manslaughter as a second-felony habitual offender was eighty years). Following 142his appeal and conviction on retrial, Mr. Johnson was again sentenced to the maximum sentence for manslaughter, forty years at hard labor. A different trial judge presided over Mr. Johnson’s retrial and sentencing, and she gave extensive reasons for imposing the maximum sentence of forty years, which are outlined above. In the same proceeding Mr. Johnson was again adjudicated a second-felony habitual offender, and the trial court vacated the sentence it had imposed earlier and imposed the maximum sentence of eighty years at hard labor for the reasons it had already stated. Mr. Johnson now argues that the imposition of a more onerous sentence after his retrial violated his due process rights by casting a chilling effect on his right to appeal.
 

 Since the trial judge who imposed the present eighty-year sentence on Mr. Johnson was not the same judge who imposed the original fifty-year sentence on him as a second offender, the
 
 Pearce
 
 presumption of vindictiveness does not apply. Nonetheless, the cases cited above still require the record to show the basis for the departure from the original sentence. It is unclear if additional information was adduced at Mr. Johnson’s retrial that was not elicited at his first trial because the transcript of that trial is unavailable, and this unavailability was the basis of the reversal of his first manslaughter conviction. For this same reason, the trial court judge who retried Mr. Johnson was unable to know what occurred during the first trial, and could only base Mr. Johnson’s sentencing on the information and testimony presented at the second trial.
 

 | blinder the circumstances presented in this case—a different trial judge imposing a more onerous sentence—the defendant, Mr. Johnson, had the burden of affirmatively proving vindictiveness on the part of the trial judge. We find he failed to satisfy his burden of proof. As the State points out, before imposing the eighty-year sentence the trial court heard the evidence at trial, the evidence at the multiple bill hearing, and the victim impact testimony. The trial court gave detailed reasons for the sentence it imposed, which are outlined above. Although the trial judge did not give any indication as to why she was imposing a more onerous sentence than the prior judge imposed, the record contains no proof of vindictiveness. We thus find this argument unpersuasive.
 

 Second-Felony Habitual Offender Adjudication
 

 Mr. Johnson argues that the trial court erred in adjudicating him a second-felony habitual offender based on the State’s fingerprinting expert, N.O.P.D. Officer Joseph Pollard, matching fingerprints on an arrest card. Mr. Johnson emphasizes the lack of fingerprints on the bill of information or documents of conviction.
 

 
 *1214
 
 To prove a defendant is a habitual offender under La. R.S. 15:529.1, the State is required to establish the prior felony conviction and that the defendant is the same person convicted of that felony.
 
 State v. Payton,
 
 00-2899, p. 6 (La.3/15/02), 810 So.2d 1127, 1130 (citing
 
 State v. Neville,
 
 96-0137 (La.App. 4 Cir. 5/21/97), 695 So.2d 534, 538-39). The Louisiana Supreme Court “has repeatedly held that [the Habitual Offender Act]
 
 does not require the State to use a specific
 
 |
 
 utyye of evidence to carry its burden at an habitual offender hearing and that prior convictions may be proved by any competent
 
 evidence.”
 
 Payton,
 
 00-2899 at p. 8, 810 So.2d at 1132 (quoting
 
 State v. Lindsey,
 
 99-3302, p. 7 (La.10/17/00), 770 So.2d 339, 344)(emphasis in original). Proof of identity can be established in various ways, including the State presenting: (1) the testimony of witnesses to pri- or crimes, (2) expert testimony matching the fingerprints of the accused with those in the record of the prior proceeding, (3) photographs contained in a duly authenticated record, or (4) evidence of identical drivers license number, sex, race, and date of birth.
 
 Payton,
 
 00-2899 at p. 6, 810 So.2d at 1130;
 
 State v. Isaac,
 
 98-0182, p. 7 (La.App. 4 Cir. 11/17/99), 762 So.2d 25, 28-29. In
 
 Payton, supra,
 
 the N.O.P.D. fingerprint expert matched the defendant’s fingerprints to fingerprints on the backs of two arrest registers for the two previous convictions. The Louisiana Supreme Court held that this was sufficient proof of identity.
 

 At the hearing in this case, Officer Pollard identified three exhibits: (i) the fingerprints he took from Mr. Johnson in court that day; (ii) a fingerprint card— arrest card — from a prior arrest that he brought with him to court; and (iii) a certified packet from Mr. Johnson’s prior conviction containing the bill of information, guilty plea form, docket master, minute entry, and arrest register.
 

 Officer Pollard matched the fingerprints taken from Mr. Johnson in court to fingerprints on an arrest card from the prior arrest. He also matched the arrest card to the information in the certified packet to establish that the Jeremy Johnson listed on the arrest card for the prior offense was the same person who pleaded guilty to |4Bthe prior offense and was the same person who was convicted of the instant offense. That arrest card contained the same name as the defendant, Jeremy Johnson, and a social security number.
 

 The arrest register reflected an April 5, 2002, arrest of a Jeremy Johnson for the armed robbery of victim Freddie Callaway. Jeremy Johnson’s social security number on the arrest register was the same as the Jeremy Johnson’s whose fingerprints were on the arrest card. The state identification (“SID”) number listed on the arrest card for Jeremy Johnson matched the SID number listed on the arrest register for Jeremy Johnson.
 

 The folder number on the arrest card matched the folder number on the arrest register. As to the folder number, Officer Pollard explained that a folder number is unique in that it is issued only once for each arrest regardless of whether the same person is arrested more than once.
 
 [2]
 
 
 *1215
 
 Accordingly, Officer Pollard accurately linked up all these documents to establish that Mr. Johnson was the same individual convicted of simple robbery in October 2002. The record thus supports the trial court’s finding that Mr. Johnson was a second-felony habitual offender.
 

 \J)ECREE
 

 For the foregoing reasons, the defendant’s conviction and sentence are affirmed.
 

 AFFIRMED.
 

 [1]
 

 . The sentencing range for a manslaughter conviction as a second-felony habitual offender is twenty to eighty years at hard labor, pursuant to La. R.S. 14:31(B) and La. R.S. 15:529.1(A)(1)(a).
 

 [2]
 

 . A copy of a Orleans Parish District Attorney Office screening action form, accepting a charge of armed robbery against Jeremy Johnson, a/k/a "Puffy,” contains the same item number, arrest number, "B of I” number and "motion” number as the arrest register, and the date of birth for Mr. Johnson was the same on both documents. The record contains a copy of a May 24, 2002 bill of information from Orleans Parish, case number 430-549, charging Jeremy Johnson, a/k/a/ "Puffy,” with the April 5, 2002 armed robbery of Freddie Calloway. The bill was amended on October 18, 2002, to charge simple robbery. Con
 
 *1215
 
 sistent with the date of the amended bill of information and the reduced charge, the record contains a copy of a October 18, 2002 "Waiver of Constitutional Rights/Plea of Guilly” form in case number 430-549, reflecting a plea of guilty by Jeremy Johnson to simple robbery.